

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD76764 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | September 16, 2014 |
| BARBARA A. BARKER, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Bates County, Missouri**
The Honorable James K. Journey, Judge

Before Division Four: Alok Ahuja, Chief Judge, Presiding, Cynthia L. Martin, Judge and
Randall R. Jackson, Special Judge

Barbara Barker ("Barbara") appeals her conviction following a jury trial of promoting child pornography in the second degree on a theory of accomplice liability. She raises five points on appeal, asserting the trial court erred in: (1) overruling her motion to suppress evidence seized from her home and overruling her objections to the admission of such evidence at trial; (2) overruling her objection to the admission of photographs seized from her home; (3) allowing a witness to testify that Barbara invoked her right to an attorney; (4) allowing testimony concerning out-of-court statements,

including a guilty plea, made by James Barker ("James")[1]; and (5) overruling her motion for judgment of acquittal because there was not sufficient evidence from which the jury could find her guilty beyond a reasonable doubt.

Because we conclude that there was not sufficient evidence from which the jury could find Barbara guilty beyond a reasonable doubt, we reverse and vacate Barbara's conviction and sentence.

### Factual and Procedural History[2]

In March 2012, the Bates County Sheriff's Department questioned Jessica Haus ("Haus") as a suspect in the theft of Barbara's prescription medication. At the time, Haus, who is married to Barbara's son, shared a residence in Rich Hill with Barbara and Barbara's husband, James. During this questioning, Haus told Detective Ken Rush ("Detective Rush") that she had witnessed James viewing child pornography on his home computer on several occasions and that his computer had screen savers featuring naked children. Based on Haus's statements, a search warrant was secured. Law enforcement executed the search warrant and seized James's computer, along with numerous computer disks, DVDs, and CDs. Several thousand images of naked children were found on these items.

James was arrested. Barbara went to the police station to drop off medical supplies for James. Detective Paul Mangano ("Detective Mangano") took advantage of

---

[1]Because Barbara Barker and James Barker share the same surname, we refer to each by first name for purposes of clarity. No familiarity or disrespect is intended with respect to any of the parties.

[2]"We view the evidence in the light most favorable to the conviction." *State v. Sutton*, 427 S.W.3d 359, 359 n.1 (Mo. App. W.D. 2014).

2

the opportunity to take a statement from Barbara. Barbara was advised of her *Miranda*[3] rights, ultimately signed a waiver, and gave a statement. Barbara told Detective Mangano that she caught James looking at pictures of naked young boys on his computer about six months before his arrest, and that she was disgusted and removed the files from his computer and installed parental controls. Barbara told Detective Mangano that James's computer had frozen up on several occasions in the three to four weeks immediately preceding James's arrest, and that she had, at James's insistence, restored the computer on each occasion. Barbara also told Detective Mangano that if child pornography were found on the computer, she would believe that James had put it there.

Barbara was charged by Information with violation of Section 573.035,[4] the class B felony of possession of child pornography in the second degree, in that "on or about March 8, 2012, . . . the defendant, acting together with [James] knowingly possessed child pornography of a person less than eighteen years of age, consisting of a naked prepubescent female lying on her back with her legs spread exposing her vagina." Barbara was tried on a theory of accomplice liability, with James as the principal actor in the crime.[5] The jury returned a guilty verdict. The trial court entered a judgment of conviction and sentenced Barbara to 45 days in jail and a fine of $1,000. Barbara's sentence was stayed pending appeal.

Barbara appeals.

---

[3]*Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).
[4]All statutory references are to RSMo 2000 as supplemented, unless otherwise indicated.
[5]James had previously entered a guilty plea to commission of the principal crime.

**Analysis**

As previously noted, Barbara raises five points on appeal. Her fifth point on appeal is dispositive, rendering it unnecessary for us to address Barbara's remaining points.

In her fifth point on appeal, Barbara argues that the trial court erred in overruling her motion for judgment of acquittal at the close of the State's evidence because there was insufficient evidence to permit the jury to conclude beyond a reasonable doubt that she was guilty of the crime charged in the Information on a theory of accomplice liability. Specifically, Barbara argues that the evidence did not support a reasonable inference that she engaged in conduct for the purpose of aiding or encouraging James's possession of the pornographic image identified in the Information.

We review the denial of a motion for judgment of acquittal the same as we review a challenge to the sufficiency of the evidence. *State v. McQuary*, 173 S.W.3d 663, 666-67 (Mo. App. W.D. 2005). "We must determine 'whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt, not whether the verdict was against the weight of the evidence.'" *Id*. at 667 (quoting *State v. Botts*, 151 S.W.3d 372, 375 (Mo. App. W.D. 2004)). On review, "'we accept[] as true all evidence and its reasonable inferences in a light most favorable to the verdict and reject[] all contrary evidence and inferences.'" *Id.* (quoting *Botts*, 151 S.W.3d at 375). However, we "may not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inference." *State v. Loyd*, 326 S.W.3d 908, 916 (Mo. App. W.D. 2010).

"The law of accessory liability emanates from statute, as construed by the courts." *State v. Barnum*, 14 S.W.3d 587, 590 (Mo. banc 2000). In pertinent part, section 562.041 provides that "[a] person is criminally responsible for the conduct of another when . . . [e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2). "This subsection is designed to make individuals who could not be guilty of a crime solely on the basis of their own conduct, guilty nonetheless as an accessory." *Barnum*, 14 S.W.3d at 590. Thus, "[a]n accomplice is one who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission of a crime." *State v. May*, 71 S.W.3d 177, 183 (Mo. App. W.D. 2002).

"The doctrine of accomplice liability embodied in section 561.041.1(2) comprehends any of a potentially wide variety of actions intended by an individual to assist another in criminal conduct." *Barnum*, 14 S.W.3d at 591 (citation omitted). However, the evidence must establish that, "***with the purpose to promote the offense***, [an accomplice] aided or encouraged another person's conduct that constituted the offense." *State v. Wilson*, 359 S.W.3d 60, 67 (Mo. App. W.D. 2011) (emphasis added). Key to accomplice liability, therefore, is that conduct without the requisite culpable mental state is not sufficient to support a conviction. *State v. Holmquest*, 243 S.W.3d 444, 449 (Mo. App. W.D. 2007) (holding that the required culpable mental state of an accomplice is that the accomplice acted with the purpose to promote the commission of the offense for which he is being held liable). Missouri cases characterize conduct coupled with the

5

requisite *mens rea*--that is, the purpose to promote the principal's commission of a crime--as "affirmative participation." *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998), *cert. denied*, 525 U.S. 1085 (1999).

"Any evidence, either direct or circumstantial, that shows affirmative participation in aiding the principal to commit the crime is sufficient to support a conviction." *State v. Smith*, 108 S.W.3d 714, 719 (Mo. App. W.D. 2003). "Affirmative participation may be proven by inference." *State v. Williams*, 409 S.W.3d 460, 468 (Mo. App. W.D. 2013). "Circumstances that *may* support the inference of an accomplice's affirmative participation include 'presence at the crime scene; flight therefrom; association or companionship with others involved before, during, and after the crime; conduct before and after the offense; knowledge; motive; and a defendant's attempt to cover up his involvement.'"[6] *Id.* (quoting *Smith*, 108 S.W.3d at 719) (emphasis added). The accomplice must embark '"upon a course of criminal conduct with others,'" making him "'responsible for those crimes which he could reasonably anticipate would be a part of that conduct.'" *State v. Robinson*, 196 S.W.3d 567, 570 (Mo. App. S.D. 2006) (quoting *State v. Workes*, 689 S.W.2d 782, 785 (Mo. App. E.D. 1985) (emphasis added)).

---

[6]We emphasize "may" because the presence of evidence establishing one of the identified "circumstances" does not necessarily support an inference of criminal intent. An illustrative edification of this principle as applied to accomplice liability is seen in the seemingly conflicting treatment of the circumstance of presence at the crime scene. We have recognized that "[c]ircumstances that may support the inference of an accomplice's affirmative participation include 'presence at the crime scene.'" *Williams*, 409 S.W.3d at 468 (quoting *Smith*, 108 S.W.3d at 719). Yet, we have also unequivocally held that "mere presence at a crime scene, considered alone or in combination with a refusal to interfere, is insufficient to support a conviction" on a theory of accomplice liability. *Barnum*, 14 S.W.3d at 591. These seemingly inconsistent holdings peacefully co-exist on the continuum of reasonable inference. Stated differently, the presence of a particular circumstance is not self-proving of criminal intent, but *may* support an inference of criminal intent if the totality of the evidence establishes that the inference is reasonable.

However, "[n]o particular physical act is necessary in order to [support accomplice liability]." *State v. Richardson*, 923 S.W.2d 301, 317 (Mo. banc 1996).

With these principles in mind, we must determine whether the evidence in this case, viewed in the light most favorable to the verdict, established beyond a reasonable doubt that Barbara "affirmatively participated" in James's commission of the charged offense--knowing possession of the discrete image identified in the Information.

Barbara's trial was not lengthy. The State first admitted numerous exhibits containing hundreds of images purporting to represent child pornography. Though hundreds of images were admitted into evidence, only one exhibit, State's Exhibit 5, depicted the image described in the Information. Consistent with the Information, the verdict director at Barbara's trial required the jury to find beyond a reasonable doubt, in pertinent part, that:

> First, that on or about March 8, 2012, in the County of Bates, State of Missouri, that James Barker possessed a visual depiction consisting of a still image stored by electronic means, which is capable of conversion into a visual image, represented by State's Exhibit # 5, and

> Second, that the visual depiction was a person, under the age of eighteen years engaging in sexually explicit conduct, namely: - a young naked, prepubescent female lying on her back with her legs spread exposing her vagina, and

> Third, that with regard to the facts and circumstances submitted in this instruction that James Barker acted knowingly,

> then you are instructed that the offense of Possession of Child Pornography has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

7

Fourth, that with the purpose of promoting or furthering the commission of Possession of Child Pornography, the defendant acted together with or aided James Barker in committing the offense,

then you will find the defendant guilty of Possession of Child Pornography

. . . .

As used in this instruction, a person acts purposefully, or with purpose, with respect to the person's conduct or to a result thereof when it is his or her conscious object to engage in that conduct or to cause that result.

Thus, to convict Barbara, the jury had to find beyond a reasonable doubt that she purposefully promoted James's knowing possession on March 8, 2012 of the pornographic image depicted in Exhibit 5.

The sum and substance of the State's evidence offered to establish that Barbara "affirmatively participated" in James's commission of the principal crime was limited to the testimony from three witnesses: (i) Detective Mangano; (ii) Haus; and (iii) Sheriff Chad Anderson ("Sheriff Anderson"). Detective Mangano testified that:

Barbara came by the sheriff's department after James was arrested "because she had some medication that her husband needed," and he "decided to talk to her while she was there."

Barbara ended up "telling [him] she wanted to make a statement."

Barbara at first said she had no idea what was on James's computer, then later said "there was pictures of naked children on that computer." Barbara said she believed the ages of the children were "[a]pproximately 12 or 13 years old."

Barbara said "the computer would get locked up and that she would have to take a start-up disk to clean the computer and restart the computer. *And that approximately six months before our arrival there*, she had seen pictures of young children on there standing nude, and *then she then went and put parental locks on there*."

8

Barbara said that she had "walked from the kitchen into the living room-- [James] has a glass display case of, like, old ships--model ships, and *she said she thought she had seen a reflection of two young boys standing nude from the reflection on the glass*."

Barbara said *she "walked in there and she had told [James] that she thought that was nasty and he needed to get that shit off his computer*."

Barbara reported that *she worked to fix James's locked up computer "four or five times approximately three or four weeks before our arrival*."

Finally, when asked "*if we were to find child pornography* on the computer, would she believe [James] had put it there," Barbara responded that "*she would believe that he would hav*e" put it there.

(Emphasis added.) A written version of Barbara's narrative statement was not introduced into evidence.[7]

The State then called Haus who testified that:

She had seen screen savers on James's computer from time to time showing naked young girls.

James "*always had the door shut*" and she would "knock on the door to serve" him meals, "and he would be looking at this child pornography." James would spend "[p]retty much all day" at the computer, coming out "to get a cup of coffee, go to the bathroom, things like that." James ate most of his meals "in front of the computer."

Barbara did not take James's his meals in the computer room, and would make him "go and get it himself" if Haus did not take the meal to him.

Haus was asked if she ever witnessed Barbara "confront [James] about [the] alleged pictures on his computer." She testified that she had, and that

---

[7]During Detective Mangano's testimony, the State admitted Exhibit 40 while discussing Barbara's waiver of her *Miranda* rights. Mangano was not asked to identify Exhibit 40. However, the legal file includes an exhibit list which identifies Exhibit 40 as "Miranda Barbara Barker 3-9-12 10:15," confirming that the exhibit was the waiver of Barbara's rights, and not Barbara's statement. Barbara submitted an "appendix" with her Reply Brief which includes what purports to be the narrative statement taken by Detective Mangano from Barbara. Because the statement was not an exhibit at trial, nor otherwise a part of the legal file, we have disregarded the statement. *See Heck v. Heck,* 318 S.W.3d 760, 765 n.3 (Mo. App. W.D. 2010) ("Documents in an appendix to an appellate brief that are not contained in the record on appeal are not appropriately before this court for consideration.").

9

*Barbara "would just say that that wasn't right and it needed to be cleaned up. And she would go and clean up everything on his computer and take it all off*."

Barbara took "the pornography pictures off, maybe just once. Otherwise, it was--she would just--the computer would freeze, so she would go and take it and clean it up, just to make it work again."

On cross examination, Haus testified that *Barbara tried to delete the pornography off the computer "[j]ust one time . . . because she realized it was on there and realized it was wrong and just tried to delete them off of there*." Haus testified that *at "[n]o other times did [Barbara] realize [the pornographic pictures] were on there*," and that "*any time she saw [the pornographic pictures] and she had any idea they were there she got rid of them*."

On redirect, Haus testified that James's computer would freeze up, and James "cussed [Barbara] up one side and down the other until . . . she would go in there and spend hours trying to unfreeze his computer and clean it up and just make it work, because it would freeze up completely." Haus testified this happened approximately five times.

(Emphasis added.)

Finally, the State called Sherriff Anderson who testified that he was present in the Barkers' home when the search warrant was executed. He testified that he "asked her if there was going to be any sexually explicit photos in the house," to which Barbara responded that "the computer would crash when [James] was on the internet and she would reinstall the software and files on the computer."

At the close of the State's evidence, Barbara moved for dismissal.[8] The trial court advised:

---

[8]At the close of the State's evidence at trial, Barbara made a motion to dismiss rather than a motion for judgment of acquittal. While this designation was technically incorrect, this did not deprive Barbara of her right to have the motion considered as one for judgment of acquittal. *State v. Whitledge*, 266 S.W.2d 616, 618 (Mo. 1954). Because Barbara did not present any evidence after her motion at the close of the State's evidence was denied, she has not waived her claim of error. *State v. Nunley*, 992 S.W.2d 892, 894 n.2 (Mo. App. S.D. 1999). Barbara's

I'm concerned about one issue, [State's attorney], and I'm truly concerned about this. The paragraph 4 of your verdict director states that, for the purpose of promoting or furthering the commission of the possession of child pornography, [Barbara] acted together with or aided [James] in committing the offense. ***Can you tell me what evidence the State has proffered that allows the matter to get to the jury on that issue***?

(Emphasis added.) The State responded:

The evidence was that after [Barbara] was aware of the contents of the computer, on several occasions she went in and cleared his computer when it froze up, further enabling [James] to view these materials.

The trial court overruled Barbara's motion "at this time." Thereafter, Barbara elected not to present any evidence. The trial court was not asked to revisit its ruling about the sufficiency of the evidence prior to instructing the jury.

We believe the trial court's apprehension about the sufficiency of the evidence to establish that Barbara acted for the purpose of promoting James's knowing possession of the discrete image identified in the Information was warranted. The State argues on appeal, as it did to the trial court, that Barbara "affirmatively participated" in James's commission of the charged crime because she restored James's computer with knowledge that James had used his computer to view alleged child pornography in the past.

As we have indicated, "affirmative participation" ***may*** be inferred from any number of circumstances, including knowledge.[9] *Williams*, 409 S.W.3d at 468. However, "knowledge" necessarily refers to a principal's present commission, or intended

___

counsel did not renew the motion for judgment of acquittal after announcing his decision not to present evidence, or in a post-verdict motion as is permitted by Rule 27.07(c). Barbara's counsel was not obliged to do either to preserve the issue of the sufficiency of the evidence for appellate review in light of the fact that Barbara put on no evidence after her initial motion was denied. *See State v. McGee*, 284 S.W.3d 690, 704 (Mo. App. E.D. 2009) (citing *Nunley*, 992 S.W.2d 894-95).

[9]*See* footnote number 6.

11

future commission, of a crime. Without knowledge that a principal is committing or intends to commit a crime, an accomplice's conduct cannot be inferred to have been engaged in for the purpose of aiding or encouraging the commission of the crime. *See* section 562.041.1(2) ("A person is criminally responsible for the conduct of another when . . . *[e]ither before or during the commission of an offense* with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.") (emphasis added); *May*, 71 S.W.3d at 183 ("[a]n accomplice is one who, *before or during the commission of a crime*, intentionally and knowingly aids or encourages the commission of a crime.") (emphasis added).

Here, the State relies exclusively on Barbara's conduct in restoring James's computer to claim "affirmative participation," arguing the conduct enabled James to continue to view child pornography. The restoration of a computer is not, however, inherently incriminating conduct, and, standing alone, permits no inference of criminal intent to aid or encourage criminal behavior.[10] Thus, the evidence had to establish, at a minimum, that Barbara's conduct of restoring the computer was engaged in with

---

[10]The nature of an accomplice's conduct can itself serve as circumstantial evidence of criminal intent to aid or encourage a principal's commission of a crime if the conduct is inherently incriminating. *See, e.g., Wilson*, 359 S.W.3d 60, 68 (holding that although accomplice's mere presence in a home where drug trafficking was occurring was not sufficient to support a conviction on a theory of accomplice liability, "[p]resence may be considered *along with other incriminating evidence* to determine if the total circumstances raise a reasonable inference that the accused participated in the crime") (emphasis added). In *Wilson*, the "other incriminating evidence" included the fact that Wilson "had eight individually wrapped 'rocks' of crack cocaine in his pocket and was in close proximity to the bag of crack cocaine found on the floor beneath where he had been seated," and that the cocaine Wilson possessed was "considered to be a 'dealer's amount'." *Id*. *See also State v. Sensabaugh*, 9 S.W.3d 677, 679 (Mo. App. E.D. 1999) (holding Sensabaugh's presence in a mobile home where it was apparent that methamphetamine was being manufactured was not sufficient to establish accomplice liability, but that presence coupled with his inherently incriminating conduct in selling methamphetamine for the two women who manufactured it permitted an inference that Sensabaugh encouraged the manufacture of methamphetamine).

12

knowledge that James intended to use the computer to commit a crime before an inference could be drawn that she acted purposefully to aid or encourage James's commission of the crime charged in the Information.

The only evidence establishing that Barbara saw what James was viewing on his computer related to a period of time six months prior to James's arrest. This was long before Barbara's conduct of restoring the computer--conduct which occurred in the three to four week period immediately preceding James's arrest. There was no evidence that Barbara ever again saw suspect images on James's computer. There was no evidence explaining why James's computer crashed in the three to four weeks preceding his arrest. There was no evidence about what Barbara saw when she restored the computer in the three to four weeks prior to James's arrest. There was no specific evidence about what Barbara restored to the computer. There was no evidence indicating when the image identified in the Information was placed on the hard drive of James's computer, and thus no evidence that the image (or any other image) was accessed by James and placed on the hard drive during or after a time when Barbara restored the computer. Though hundreds of purported child pornographic images were admitted into evidence by the State, nearly all of the images were housed on external devices, and not on the computer's hard drive. No evidence connected those images temporally or otherwise to Barbara's conduct, and in any case, those images were not the subject of the Information.

The State argues that the circumstances in the household described by Haus permit an inference that Barbara knew that James intended to access child pornography if she restored the computer, and thus permit the inference that Barbara restored the computer

13

for the purpose of enabling James to do so.  The State thus asks us to conclude that it is reasonable to infer criminal intent not from knowledge that a crime is or will be committed, but from inferred knowledge that a crime is or will be committed.  The State cites no authority for this proposition.  Though it is plainly settled that criminal intent may be inferred from knowledge that a crime is or will be committed, we are aware of no authority permitting criminal intent to be inferred from inferred knowledge that a crime is or will be committed.  The absence of any such authority is consistent with the principle that "[a]n 'inference' is a conclusion drawn by reason from *facts* established by *proof*; 'a deduction or conclusion from facts or propositions known to be true.'"  *Draper v. Louisville & N.R. Co.*, 156 S.W.2d 626, 630 (Mo. 1941) (citations omitted) (emphasis in original).  It is one thing, therefore, to infer a purpose to aid or encourage from the *fact* of knowledge that a principal is committing or will be committing a crime.  It is quite another thing, however, to infer criminal intent from circumstances that *could* or *may* give rise to an inkling or suspicion that a principal is committing or will be committing a crime.  The latter scenario is more akin to "[a] *supposition* [which] is a *conjecture* based on the *possibility* that a thing could have happened.  It is an idea or notion *founded on the probability that a thing may have occurred, but without proof that it did occur*."  *Id.* (emphasis in original).  "A criminal conviction cannot be based upon probabilities and speculation."  *State v. Boyd*, 91 S.W.3d 727, 734 (Mo. App. S.D. 2002).  "While reasonable inferences **may** be drawn from direct and circumstantial evidence, 'the inferences must be logical, reasonable and drawn from established fact.'"  *State v. Power*, 281 S.W.3d 843, 845 (Mo. App. E.D. 2009) (quoting *State v. Presberry*, 128 S.W.3d 80,

14

91 (Mo. App. W.D. 2003) (emphasis added)). "[C]ourts will not supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences." *State v. Langdon*, 110 S.W.3d 807, 811-12 (Mo. banc 2003) (citing *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001)).

We find the circumstances here to be similar to those addressed in *State v. Case*, 140 S.W.3d 80 (Mo. App. W.D. 2004). In *Case*, the defendant claimed a witness at his trial, Kelly, was an accomplice to the murder he committed, and that Kelly's testimony was therefore not sufficient to support his conviction. *Id*. at 92. The evidence established that Kelly heard about the defendant's plan to murder the victim, and attempted to dissuade the defendant, saying "That's ridiculous. Why can't you just break up with her?" *Id*. at 93. The evidence also established that Kelly asked the defendant "how and why he planned on killing [the victim]." *Id*. Kelly thereafter made a phone call to set up a meeting between the defendant and the victim. *Id*. We held that Kelly's actions were neither assistance nor encouragement and "unless she hoped or desired that by making the phone call she was helping [defendant] achieve his diabolical goal – which was not the case – Kelly was not an accomplice." *Id*. Importantly, we held that "[m]ere knowledge that one's actions *might facilitate* the commission of a crime is not enough." *Id*. (emphasis added).

Similar as well are the circumstances in *Douglas v. State*, 410 S.W.3d 290 (Mo. App. E.D. 2013). In *Douglas*, a movant's Rule 24.035 motion argued a guilty plea to second degree murder and armed criminal action on a theory of accomplice liability was not supported by a sufficient factual basis. *Id*. at 292. The movant had admitted during

15

the plea hearing that he had been picked up in a vehicle by Mr. Smith; that he took over the role of driving the vehicle; that he became aware after getting into the vehicle that Mr. Smith had a handgun; that he drove the vehicle into an area at Mr. Smith's direction; and that Mr. Smith fired the handgun at people on a porch while the vehicle was stopped at a stop sign. *Id*. at 293-94. The prosecutor then advised the plea court that "for the factual basis, we need to establish that the [movant] had knowledge that Mr. Smith was going to be firing a weapon out of that vehicle." *Id*. at 294. Further questioning of the movant during the plea hearing elicited his testimony that he did not know what Mr. Smith intended to do, but that he put two and two together while driving Mr. Smith around that Mr. Smith was likely intent on avenging the earlier killing of a friend. *Id*. at 294-95. On appeal, the Eastern District concluded that these statements did not establish a factual basis for Douglas's guilty plea.

> Although the plea court established Movant was present during the crime, fled from the scene of the crime, and briefly associated with Smith before the commission of the crime, the plea court's line of questioning failed to adduce an admission by Movant that he drove the vehicle knowing that the purpose of driving the vehicle was for Smith to commit the crime.

*Id*. at 298. Though *Douglas* approached the sufficiency of the evidence to support a conviction on a theory of accomplice liability from the perspective of the factual basis to support a guilty plea, and not from the perspective of evidence and reasonable inferences therefrom to support a finding of guilt at trial, the holding is nonetheless instructive. It underscores that for conduct to support an inference of the requisite criminal intent, there must be evidence that the accomplice engaged in the conduct knowing it was for the

16

purpose of aiding the commission of a crime--and thus knowing at the time the conduct is undertaken that a crime is being or will be committed.

Here, the evidence viewed in a light most favorable to the State did not establish that Barbara knew when she restored James's computer that James was committing, or was intending to commit, the crime of possessing child pornography. At best, Barbara could have suspected that her conduct might facilitate James's possession of child pornography--an insufficient basis to convict on a theory of accomplice liability. *Case*, 140 S.W.3d at 93; *Douglas*, 410 S.W.3d at 298. Even more compelling, no evidence indicated when the image identified in the Information was placed on the hard drive, meaning the State did not establish as a matter of law that Barbara's conduct in restoring the computer aided or encouraged James's possession of the image.

An inference of knowledge that a crime might be committed is insufficient standing alone to support a reasonable inference that an accomplice purposefully aided or encouraged the commission of a crime by conduct that is not inherently incriminating. Were we to conclude otherwise, we would be criminalizing non-incriminating conduct merely the actor could have anticipated that the conduct might facilitate the commission of a crime. For example, a parent whose child has wrecked a family vehicle while under the influence of alcohol could face criminal accomplice liability if the parent replaces and lets the child drive the vehicle, worried the child may continue to drink and drive. Anyone who permits another to use a computer knowing the person has previously accessed child pornography on a computer could face accomplice liability. The purchase of a new computer for a person known to have accessed child pornography on a computer

17

could result in accomplice liability. The continued payment of a bill for the provision of internet access with knowledge that another in the home has previously used the internet to access child pornography would support accomplice liability. Giving money to a known drug addict where the money is thereafter used to buy drugs could support accomplice liability.

Plainly, these examples are absurd in their reach. Yet, they are legally indistinguishable from the circumstances in the case before us. Accomplice liability requires the State to establish beyond a reasonable doubt not merely conduct that technically facilitates the commission of a crime, but as well that the conduct was engaged in with the purpose to aid or encourage the commission of a crime. "[Only] [i]f an accomplice has a purpose to promote an offense, [may] he . . . be found to have the required culpable state of mind for that offense." *State v. Roberts*, 709 S.W.2d 857, 863 (Mo. banc 1986). That required *mens rea* cannot be inferred in the absence of evidence that the accomplice **knew** a crime was being committed or was intended to be committed. "'[M]ere suspicion, however strong, will not take the place of evidence when life or liberty is at stake.'" *Smith*, 108 S.W.3d at 719 (quoting *State v. Coons*, 743 S.W.2d 112, 114 (Mo. App. W.D. 1988)). Based on the evidence in this case, inferring that Barbara "affirmatively participated" in James's possession of child pornography when she restored his computer because she could have known that he intended to use the computer to commit a crime is not a reasonable inference, and is instead purely speculative.[11]

[11]Our independent research failed to unearth a single reported case in the state of Missouri, or in any jurisdiction for that matter, where a household member has been convicted of possession of child pornography on a theory of accomplice liability, rendering the decision to charge Barbara on that theory unusual and noteworthy.

*Langdon*, 110 S.W.3d at 811-12; *Power*, 281 S.W.3d at 845, *McMullin*, 136 S.W.3d at 573. "A verdict based on suspicion will not be permitted to stand." *Smith*, 108 S.W.3d at 719.

The State argues that other evidence should couple with Barbara's suspicion about James's use of the computer to support the inference that her conduct in restoring the computer was "affirmative participation." The State argues that Barbara's "purpose or intent" to aid or encourage James's knowing possession of child pornography can be inferred from the additional fact that she gave false information to the police. Mangano testified that Barbara initially said "she had no idea what was on the computer," but then said that she had seen naked pictures on James's computer. The State argues the jury could have reasonably "construed the initial lie and subsequent admission as consciousness of guilt." We disagree.

It is true that "[w]hen proven false, exculpatory statements evidence a consciousness of guilt." *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo. App. S.D. 2000). It is not clear, however, that Barbara's initial statement was false. From the trial transcript, it appears Barbara may have been asked two questions by Detective Mangano: whether she knew what was on the computer *at the time of James's arrest*, and whether she had previous knowledge about what was on the computer. In this light, Barbara's initial response was truthful, and was not contradictory to her subsequent response. Consistent with this view of Barbara's statement, though there was evidence that Barbara knew six months before James's arrest what was on the computer, there was no evidence Barbara knew what was on the computer at the time James was arrested. In fact, Mangano

19

hypothetically asked Barbara whether she would believe James was responsible for placing child pornography on his computer *if the police were to find same*. Accordingly, it cannot be said that Barbara's initial statement was "proven false." *Hibbert*, 14 S.W.3d at 253.

The State also argues that we should consider the additional circumstance that Barbara's "tolerance for her husband's unsavory habits may be inferred from the fact that after he was arrested with several thousand images of child pornography, [Barbara] vented her anger not at her husband, but at the police (whom she threatened to sue)." This argument is based on Mangano's testimony that, when Barbara arrived at the police station, she "stated that if anything was to happen to her husband, that she would sue the sheriff's office for everything they had." This testimony did nothing to establish that Barbara "tolerated" James's "unsavory habits." The statement on which the State relies follows testimony that Barbara had brought to the police station James's medication and a breathing apparatus for sleeping, and had expressed concern for his physical well-being. Barbara's statement merely stressed the police department's obligation to care for James's physical well-being, not a belief that his possession of child pornography should be tolerated.

In summary, the evidence does not support a reasonable inference that Barbara restored James's computer with the purpose or intent of aiding or encouraging James's knowing possession of child pornography, and specifically the image identified in the Information. There was no evidence presented from which a reasonable juror could find

Barbara guilty beyond a reasonable doubt of possession of the image described in the Information as an accomplice.

Barbara's fifth point on appeal is granted.

## Conclusion

The trial court erred in overruling Barbara's motion for judgment of acquittal at the close of the State's evidence. The trial court's judgment is reversed. Barbara's conviction and sentence are vacated, and Barbara is ordered discharged.


_Cynthia L. Martin_
_____
Cynthia L. Martin, Judge


All concur